UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 MAR 31  PM 3: 00

CLERK

BY _____
DEPUTY CLERK

JOSEPH V. ANGLIN,                )
                                 )
        Plaintiff,               )
                                 )
    v.                           )        Case No. 2:19-cv-219
                                 )
TODD B. HUNTER, in his capacity as Acting    )
Secretary, U.S. Department of Veterans Affairs,  )
                                 )
        Defendant.               )

**OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR PARTIAL**
**SUMMARY JUDGMENT AND MOTION IN LIMINE AND**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
(Docs. 41, 47)

Self-represented Plaintiff Joseph V. Anglin commenced this action against the
Secretary of the U.S. Department of Veterans Affairs ("VA").[1] On March 26, 2020, the
court granted the parties' joint motion to stay the case pending resolution of a related
matter before the Merit System Protection Board ("MSPB"). On November 4, 2021, the
MSPB issued its opinion in favor of the VA. Following the court's January 9, 2023
Opinion and Order ("O & O"), Plaintiff's remaining claim is for age discrimination under
the Age Discrimination in Employment Act of 1967 ("ADEA"). Plaintiff moves for
partial summary judgment as well as "in limine" for an adverse inference. (Doc. 41.)
Defendant opposes the motions and cross-moves for summary judgment. (Doc. 47.)

I.      **Procedural History.**

On February 4, 2017, following the conclusion of his employment with the VA,
Plaintiff filed a claim with the Equal Employment Opportunity Commission ("EEOC")

---

[1] On January 20, 2025, Todd B. Hunter was appointed Acting Secretary and automatically
substituted for the former Secretary as the Defendant in this case. *See* Fed. R. Civ. P. 25(d). The
Clerk's Office is respectfully requested to revise the docket as indicated above.

alleging discrimination based on age and retaliation. The retaliation claim stemmed from a prior complaint of age discrimination which Plaintiff filed against the Internal Revenue Service ("IRS"). Following the EEOC's grant of summary judgment in favor of the VA on September 5, 2019, Plaintiff initiated this action on November 25, 2019.

On May 17, 2019, Plaintiff also filed an appeal with the MSPB alleging the VA retaliated against him in violation of the Whistleblower Protection Act of 1989 ("WPA") and the Whistleblower Protection Enhancement Act of 2012 ("WPEA"). On March 30, 2020, upon a joint motion of the parties, this action was stayed because "of the overlap between the MSPB proceeding and this case[.]" (Doc. 7 at 1.) On December 7-8, 2020, an MSPB Administrative Law Judge ("ALJ") held a hearing and on September 30, 2021, issued an Initial Decision denying Plaintiff's request for corrective action under the WPA. The decision stated that it would become final on November 4, 2021, unless a petition for review was filed by that date. Because Plaintiff did not file a petition, the Initial Decision became final on November 4, 2021.

While his appeal was pending before the MSPB, on May 9, 2020, Plaintiff filed a complaint with the Secretary of Labor asserting that his termination violated the Veterans Employment Opportunity Act ("VEOA"). On May 18, 2020, the Department of Labor notified Plaintiff that it was closing its investigation of his VEOA complaint. On May 21, 2020, Plaintiff pursued his VEOA claim before the MSPB by filing an appeal asserting that the VA violated the VEOA when it terminated his employment without affording him a right to advance notice and the right to respond. On June 26, 2020, the ALJ dismissed the VEOA appeal because Plaintiff had failed to timely exhaust his claim under 5 U.S.C. § 3330a by failing to file his complaint with the Secretary of Labor within sixty days of his termination. The decision stated that it would become final on July 31, 2020, unless a petition for review was filed by that date. Because Plaintiff did not file a petition, the Initial Decision became final on July 31, 2020.

On December 7, 2021, Plaintiff timely filed a First Amended Complaint ("FAC") in this action. Defendant responded with a motion to partially dismiss the FAC under Fed. R. Civ. P. 12(b)(1) and (6) for lack of jurisdiction and for failure to state a claim

2

upon which relief may be granted. Defendant did not move to dismiss Plaintiff's claim of age discrimination brought under the ADEA. In its January 9, 2023 O & O, this court determined it lacked subject matter jurisdiction over Plaintiff's VEOA, WPA, WPEA, and constitutional claims and dismissed Plaintiff's claim under the Americans with Disabilities Act of 1990 as well as his claim that he suffered retaliation in violation of the ADEA for failure to state a claim on which relief could be granted.

## II.    Whether the Court Should Grant an Adverse Inference for Spoliation.

Plaintiff requests the court apply an adverse inference against Defendant for spoliation of evidence.[2] Plaintiff claims he met weekly with his supervisor, Alfred Montoya ("Director Montoya") from January 10 until December 9, 2016, and that he was responsible for "creat[ing] two original records documenting each [] weekly meeting." (Doc. 41 at 18.) "Plaintiff hand delivered one copy to [Director Montoya] at the start of each meeting attended by both parties. Plaintiff was further responsible to keep an original record locked in his office, in the bottom right-hand drawer of his desk." *Id.* "Allowing for some last-minute unplanned weekly meeting cancellations, Plaintiff estimates there were approximately forty" physical copies of weekly records filed in his office at the time he was terminated. *Id.* "Presumably, an exact original copy, less Plaintiff's handwritten notes, was kept with the Defendant." *Id.*

As relief, Plaintiff requests the court to "accept[] as true" the following:

(1) Defendant required Plaintiff to seek employment more suitable for Plaintiff's age and experience, and this requirement was documented in multiple weekly records.

(2) Plaintiff submitted 32[] applications for employment in 2016, at the direction of Defendant, to obtain employment more suitable for Plaintiff's age and experience, and this is documented in multiple weekly records.

---

[2] Because spoliation can impact summary judgment, the court considers Plaintiff's motion first. *See Herman v. City of N.Y.*, 334 F.R.D. 377, 390 (E.D.N.Y. 2020) ("In borderline cases, an inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment.") (internal quotation marks omitted).

    (3) Plaintiff and Defendant discussed and documented many of Plaintiff's 2016 32[] employment applications in multiple weekly meetings record[s].

    (4) Not a single weekly record documents or chronicles anything less than satisfactory performance as it relates to Plaintiff's employment performance and qualifications.

    (5) As early as October 2016, Defendant instructed Plaintiff to delegate all his duties and responsibilities to the intern Tang during Plaintiff's absence.

    (6) For any other facts not herein listed that would reasonably be expected to be included in, or chronicled in, a weekly record, the [c]ourt impose a mandatory, albeit rebuttable, presumption favorable to the [P]laintiff.

. . .

    (7) A presumption the lost evidence is relevant and favorable to the Plaintiff.

(Doc. 41 at 28.)

In support of his argument, Plaintiff points to an undated one-page agenda without an email cover page that he contends was created in April 2016 and which was attached to the FAC. *See* Doc. 18-13. Defendant contends: (1) the April 2016 agenda was fabricated by Plaintiff; (2) that it is inconsistent with undisputed evidence regarding when Plaintiff began to produce agendas in that format; (3) that Plaintiff had ample time to preserve a copy of all documents during the period before filing discrimination claims against the IRS and his EEOC claim against Defendant in this case; and (4) that the first time Plaintiff offered the purported April 2016 agenda as evidence was on August 12, 2019, when he filed his opposition to the VA's motion for summary judgment in his administrative proceedings before the EEOC.

During discovery in this action, Defendant produced eight electronic copies of weekly agendas. Director Montoya has declared that the documents of which he was aware relating to the weekly meetings were produced to Plaintiff and consist of the agendas that Plaintiff prepared for the weekly meetings taking place from September to December 2016. *See* Doc. 47-48 at 9. Director Montoya has declared under penalties of perjury that Plaintiff was not responsible for preparing agendas in April of 2016. Plaintiff

4

has produced no evidence to the contrary. Although Plaintiff claims that the remaining agendas he prepared are missing, he does not explain how they are material to his claim.

A district court may impose sanctions for spoliation pursuant to its inherent power to control litigation. *See West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *see also id.* ("A federal district court may impose sanctions under Fed. R. Civ. P. 37(b) when a party spoliates evidence in violation of a court order."). Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Id.*

To obtain an adverse inference based on spoliation, a party must establish:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012) (internal quotation marks omitted). "[F]or sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence *actually existed and was destroyed*." *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 441 (S.D.N.Y. 2010) (emphasis and brackets in original) (internal quotation marks omitted). "The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge[.]" *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).

With regard to electronically stored information, *see* Fed. R. Civ. P. 37(e), the Second Circuit has recently clarified that "an 'intent to deprive' another party of the lost information" is required to impose sanctions and that the "lesser 'culpable state of mind' standard, which includes negligence, does not apply[.]" *See Hoffer v. Tellone*, 128 F.4th 433, 435 (2d Cir. 2025) (internal citation omitted).

Here, the parties disagree as to whether any weekly meeting agendas were destroyed. Defendant asserts that Plaintiff's document relating to an April weekly meeting is a fabrication Plaintiff created for purposes of litigation because the template for the weekly agendas was not created by Director Montoya until August 2016.

5

Defendant further points out that Plaintiff did not ask for the documents in discovery in the action pending before this court and Plaintiff has not filed a motion to compel.

This court's Local Rule 26(c) states a party may not file a motion related to discovery "unless the filing party has conferred with opposing counsel in a good faith effort to reduce or eliminate the controversy or arrive at a mutually satisfactory resolution." D. Vt. L.R. 26(c)(1).[3] It further requires that, if discovery issues are not resolved, "a motion must include an affidavit" containing "certification that counsel have conferred in good faith to resolve the dispute without court intervention; [] dates of consultation with opposing counsel; [] names of the participants; [] length of time of the conferences; [] any issues still unresolved; and [] the reasons for the unresolved issues." *Id.* 26(c)(2).

In his "motion in limine," "Plaintiff certifies that Plaintiff and Defendant have conferred in good faith to produce the original weekly records[:] (1) in an Equal Employment Opportunity Commission (EEOC) discovery process, (2) in a Merit System Protection Board (MSPB) discovery process, and (3) in this action[.]" (Doc. 41 at 19.) Defendant claims it had "no advance warning" that Plaintiff intended to move for sanctions in this case. (Doc. 47 at 39.) Plaintiff responds that:

> To claim Plaintiff did not consult with Defendant before filing a motion for sanctions contradicts the record. Plaintiff sought the records for more than three years and [in] three separate processes. Plaintiff consulted with [D]efendant in a grueling deposition conducted over two days: November 21, 2023, and January 17, 2024.

(Doc. 48 at 38.)

Plaintiff's motion and his attached affidavit and exhibits do not comply with the Local Rule as Plaintiff has not provided the court with the dates of consultation, names of participants, or length of time of the conferences as required. *See* D. Vt. L.R. 26(c)(2). Plaintiff has therefore failed to establish he conferred in good faith with Defendant before

---

[3] In addition, Local Rule 7(a) requires that a "party filing a non-dispositive motion must certify that the party has made a good faith attempt to obtain the opposing party's agreement to the requested relief." D. Vt. L.R. 7(a)(7).

filing his motion for sanctions. It is not enough for Plaintiff to claim he has sought the documents in proceedings pending elsewhere.

Because Plaintiff failed to confer in good faith and file the required certification, Plaintiff's motion must be denied. *See Biondolillo v. Livingston Corr. Facility*, 2020 WL 1887619, at *3 (W.D.N.Y. Apr. 16, 2020) (holding that "vague representations" in moving party's memorandum regarding supposed attempts to meet and confer "plainly fail to satisfy the requirement specified in th[e] [c]ourt's Local Rule"); *see also id.* ("[F]ailure to meet and confer is a sufficient basis for denying the motion to compel[.]") (internal quotation marks omitted).

As a separate ground for denial of an adverse inference due to spoliation, Defendant asserts that Plaintiff did not request the allegedly spoliated documents in discovery in this case which is a prerequisite to relief for failure to comply with discovery obligations. *See* Fed. R. Civ. P. 37(a)(3)(B)(iv). Once requested, where a party "fails to produce documents[,]" a party may "move for an order compelling . . . production[.]" *Id.* Following that, if "a party . . . fails to obey an order to provide . . . discovery, including an order under Rule . . . 37(a), the court . . . may issue further just orders." *Id.* 37(b)(2)(A). Such an order may direct that "designated facts be taken as established for purposes of the action," *Id.* 37(b)(2)(A)(i), which is the relief Plaintiff seeks. In the absence of a motion to compel that resulted in a court order requiring Defendant to provide the discovery, no sanctions may be ordered. *See Doe v. Mastoloni*, 307 F.R.D. 305, 310 (D. Conn. 2015) ("'The plain language of Rule 37(b) requires that a court order be in effect before sanctions are imposed[.]'") (quoting *Salahuddin v. Harris*, 782 F.2d 1127, 1132 (2d Cir. 1986)).

Even if the court were to consider Plaintiff's motion for an adverse inference on the merits, it would not impose sanctions. Although "the 'culpable state of mind' for a spoliation claim [involving non-electronically stored information] need not be intentional or willful, and may be found where the spoliation occurred due to negligence[,]" *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 140 (2d Cir. 2023), Plaintiff has neither established that the records he seeks "actually existed and [were] destroyed[,]" *Orbit One*

*Commc'ns*, 271 F.R.D. at 441 (emphasis and internal quotation marks omitted), nor has he established Defendant's culpable state of mind.

For the reasons stated above, Plaintiff's "motion in limine" seeking an adverse inference due to spoliation of evidence (Doc. 41) is DENIED.

## III.    The "Sham Evidence" Doctrine.

Defendant contends the April 2016 agenda was fabricated by Plaintiff to support his ADEA claim and asks the court to refuse to find a genuine issue of material fact based upon it.

At the summary judgment stage, a party may support a factual assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). Fed. R. Civ. P. 56(c) affords the opposing party the opportunity to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

"A party may not defeat summary judgment 'by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony[.]'" *Johnson v. Schmid*, 750 F. App'x 12, 17 (2d Cir. 2018) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)); *see also Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998) ("[A] party may not create an issue of fact precluding summary judgment by offering an affidavit that *contradicts* his earlier sworn testimony[.]") (emphasis in original). Indeed, "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Rsch. & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969).

In contrast, "where . . . testimony is contradicted by evidence other than the deponent's subsequent affidavit, . . . the concern that the proffered issue of fact is a mere 'sham' is alleviated." *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43-44 (2d Cir.

2000). Defendant recognizes that the sham evidence doctrine is most often triggered by a party's submission of a sham affidavit or declaration in opposition to summary judgment, but argues "courts have also applied the doctrine with respect to other forms of sham evidence[.]" (Doc. 47 at 30 n.17.)

While Defendant has grounds to raise a concern that Plaintiff has fabricated the April 2016 agenda,[4] the court could reach a definitive conclusion regarding the authenticity of that document only through fact finding and an assessment of the parties' credibility. Such an exercise is inappropriate in determining a motion for summary judgment. *See Langman Fabrics*, 160 F.3d at 112 ("Though, of course, a finder of fact may conclude that the later [proffered evidence] suggests fabrication, we are not prepared to say as a matter of law that [it] cannot be considered at the summary judgment stage."). Accordingly, the court will assume arguendo that the document is genuine solely for purposes of Plaintiff's opposition to Defendant's motion for summary judgment.[5]

## IV.    The Cross-Motions for Summary Judgment.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law[,]'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), while "[a] dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248).

On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his favor." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012). If the evidence

---

[4] As discussed *infra*, Plaintiff refused to confirm or deny authoring the document in response to Defendant's Requests to Admit and refused to admit or deny whether Director Montoya made a reference to finding a job suitable to Plaintiff's age.

[5] Plaintiff is not entitled to the same inference of authenticity in pursuing his motion for partial summary judgment. There, all reasonable inferences are drawn in Defendant's favor. *See* Fed. R. Civ. P. 56.

"presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249; *see also Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) ("The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.") (emphasis in original) (internal quotation marks and brackets omitted).

A genuine issue of fact must be established by "citing to particular parts of materials in the record[.]" Fed. R. Civ. P. 56(c)(1)(A). The non-moving party thus cannot "rely on conclusory allegations or unsubstantiated speculation[.]" *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal quotation marks omitted). In addition, "[a] non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted). Not all disputed issues of fact, however, preclude summary judgment. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

"When both parties have moved for summary judgment, 'the court must evaluate

each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Dish Network Corp. v. Ace Am. Ins. Co.*, 21 F.4th 207, 212 (2d Cir. 2021) (quoting *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017)). This includes "construing the evidence in the light most favorable to the nonmoving party[.]" *McElwee*, 700 F.3d at 640.

## V.    The Undisputed Facts.

### A.    Plaintiff's Employment at WRJ-VAMC.

On January 10, 2016, Plaintiff, then sixty years old, began probationary employment with the VA as a GS-1035-11 Public Affairs Specialist at the VA Medical Center located in White River Junction, Vermont ("WRJ-VAMC"). His functional title was Public Affairs Officer ("PAO"). Plaintiff was hired by then-Director of the WRJ-VAMC, Deborah Amdur. Although initially not interested in the job, he became interested in working "with" Director Amdur because she "was very much interacting with Congress, with the Senate, in both states, [Vermont and New Hampshire.]" Doc. 47-10 at 12 (Pl.'s Dep. Tr. 23:6-9). From 2008 to 2015, Plaintiff was "in politics." *Id.* at 7 (Pl.'s Dep. Tr. 18:2-6). At the end of 2015, he was seeking employment "to fund [him]self going to, through law school." *Id.* at 9 (Pl.'s Dep. Tr. 20:14-16).

Plaintiff believed his role as PAO "would be organizing town halls and speaking tours for [Director Amdur]" and "where she couldn't speak, [Plaintiff] would speak in her stead." *Id.* at 11 (Pl.'s Dep. Tr. 22:19-24). Plaintiff "saw a possible future . . . with somebody who actually wanted to leave the VA and actually go into politics." *Id.* at 12 (Pl.'s Dep. Tr. 23:4-6). When Director Amdur "decided to leave, [he] would leave with her and be part of her team." *Id.* (Pl.'s Dep. Tr. 23:14-15).

Director Amdur left the WRJ-VAMC before Plaintiff began his employment. For the duration of his probationary employment, he reported directly to Director Montoya, Acting Director and later Director of the WRJ-VAMC. Plaintiff characterized the situation as "a bait and switch hiring debacle." (Doc. 41-9 at 1.) In 2017, he testified to the EEOC investigator: "[T]he day I showed up for work, I meet Al Montoya for the first time. Over a short period of time, we agreed, and it was a mutual agreement . . . that he

really did not want my expertise . . . [or] my services. And I agreed that I would look for another job." Doc. 47-9 at 3 (Pl.'s Test. Tr. 6:16-21). He explained:

> [Director Montoya] agreed to help me find a job way back in April. I'm pretty sure it was around April or May, he agreed to find me a job, or help me find a job. . . . [H]e didn't want my expertise. He didn't want my talents. He wanted something different. Now, he never said it in those words, but that's how I interpreted it[.] . . . I was hired by Ms. Amdur to come in and do something completely different than what [Director Montoya] really wanted out of a Public Affairs Officer. So I didn't have a problem with that. I was going to look for a new job.

*Id.* at 9-10 (Pl.'s Test. Tr. 33:24-34:13). "[Director Montoya] didn't really want to use my skills. So the work I was asked to do was . . . pretty beneath what I was qualified to do." *Id.* at 21 (Pl.'s Test. Tr. 80:9-11).

On September 16, 2016, Director Montoya's executive assistant asked human resources whether Plaintiff was a probationary employee and was advised that he was. (Doc. 41-8 at 1.)

During 2016, Plaintiff submitted thirty-two applications for other employment. *See id.* at 21 (Pl.'s Dep. Tr. 80:21-22) ("I really wanted to find another job and get out of there[.]"). One of these applications was submitted to the IRS. During a weekly meeting in September 2016, Plaintiff informed Director Montoya that he was considering filing an age discrimination complaint against the IRS. *Compare* Doc. 41 at 4, ¶ 14 (Pl.'s Statement of Facts) ("September 16, 2016, Plaintiff informed Defendant of the possibility of filing an age discrimination complaint against the IRS."), *with* Doc. 46-3 at 3, ¶ 14 (Def.'s Statement of Disputed Facts) ("Disputed as to the stated date."); *see also* Doc. 41-5 at 3 (Director Montoya's November 13, 2017 written affidavit submitted to the VA Office of Resolution Management in the matter of the EEOC Complaint of Discrimination filed by Plaintiff).

Plaintiff drafted a letter to Senator Leahy, dated September 19, 2016, in which he requested the Senator's office "investigate the hiring practices of the IRS[.]"[6] (Doc. 41-9 at 1.) He also noted, with regard to his employment at WRJ-VAMC:

> What I didn't know until I arrived on my first day was that the job I accepted, based on multiple interviews, was not the job I was assigned when I arrived in Vermont. To my detriment[,] I relocated back to Vermont and found myself in an unimaginable position of meeting a new Hospital Director, (boss), who neither wanted nor needed my skills. In summary[,] both of us were victims of a bait and switch hiring debacle.

> To his credit, my new young supervisor, the Director of the Hospital, realized this problem and we agreed that both of us would try and endeavor to match me to a more suitable position. I can say with certainty, that my new supervisor was just as much a victim of the deceptive hiring practice that befell my circumstance.

*Id.*

On September 25, 2016, Plaintiff filed an age discrimination complaint against the IRS that included the same statements as his letter to Senator Leahy, almost verbatim. One difference was the explication of "suitable position" so the complaint read: "[W]e agreed that both of us would try and endeavor to match me to a more suitable position that could take advantage of my qualifications and experience." (Doc. 46-41 at 1.) The letter made no mention of age discrimination by Defendant.

On November 8, 2016, Plaintiff received a performance appraisal for his employment through September 30, 2016, completed by Director Montoya. Plaintiff received a rating of "Fully Successful" on the summary rating form. (Doc. 47-14 at 3.) "Fully Successful" was the middle rating between "Outstanding" or "Excellent" and "Minimally Satisfactory" or "Unacceptable." *Id.* Director Montoya also provided a written appraisal that stated that Plaintiff "struggled with various elements in his performance plan." *Id.* at 11. These included: "several occasions w[h]ere members of the

---

[6] Defendant points out there is no indication from the document, which is not an original copy, that the letter was mailed. This is immaterial because it remains an admission of a party opponent and undermines Plaintiff's claim that age discrimination, as opposed to a mismatch between Plaintiff's qualifications and the job's requirements as well as Plaintiff's job performance, was the but-for reason for Plaintiff's termination.

facility have raised issues on proper feedback[;]" issues involving events such as "Coffee with the Director"; and encouragement "to get involved in the culture of continuous improvement, learning[,] and innovation." *Id.* Director Montoya noted he "would also continue to encourage [Plaintiff] to focus on Customer Service."[7] *Id.*

On November 7, 2016, Director Montoya issued a letter of Probationary Written Counseling to Plaintiff. The letter acknowledged that the first year of Plaintiff's employment was a probationary period and that it was Director Montoya's responsibility "to study [Plaintiff's] potential closely to determine whether [Plaintiff was] suited for successful government work." (Doc. 47-19 at 1.) It stated the "formal letter of counseling" was issued to address concerns that Plaintiff was "establishing an unacceptable pattern of conduct." *Id.* The letter included four issues of concern that Plaintiff:

    (1) may not be completing tasks within the deadlines [Director Montoya] established[;]

    (2) may be inappropriately delegating tasks to individuals in your office[;]

    (3) may have conducted yourself inappropriately during the quarterly stakeholders meeting on November 2, 2016. [Director Montoya] witnessed what appeared to be you sleeping during this meeting[;]

    (4) may have conducted yourself inappropriately while identifying concerns you had regarding the quotation that was recently placed in the Director's conference room. In an email to [Director Montoya][,] [Plaintiff] addressed those concerns in a highly inappropriate way by comparing the quotation used to Mark Twain's use of the [N-word]. At no time is the [N-word] appropriate in the work place[.]

*Id.* at 1-2. Plaintiff does not dispute the existence of the letter, that he received it, or its contents.

---

[7] The position description for Plaintiff's job provides that he was expected to: "[c]onsistently communicate[] and treat[] customers (Veterans, their representatives, visitors, and all VA staff) in a courteous, tactful, and respectful manner"; "provide[] customer[s] with timely, accurate[,] and consistent information according to established policies and procedures"; and "[h]andle[] conflict and problems in dealing with customers constructively and appropriately." (Doc. 47-12 at 8.)

With regard to the first two issues, Director Montoya explained he had tasked Plaintiff "with completing a project which entailed compiling a list of year end accomplishments as well as related photographs and incorporating those into a finished product for publication . . . no later than the end of October." *Id.* at 1. Plaintiff was on approved scheduled vacation from October 21, 2016 through October 27, 2016.[8] Director Montoya noted that he and Plaintiff met on Friday, October 28, 2016, regarding the project. The product was not delivered by the end of October deadline.

Director Montoya's concern regarding Plaintiff's inappropriate delegation stated: "It was brought to my attention that you may have delegated the year end accomplishments task to another individual in your office. It is my expectation[] that if I[,] as your supervisor, assign you a task that you be the one to complete that task." *Id.* Plaintiff corroborated the delegation in his FAC:

> On or about October 20, 2016, Plaintiff tasked the Public Affairs Intern to format a document and instructed her to have it completed for when Plaintiff returned from vacation. . . . On October 28, 2016, Plaintiff . . . learned . . . Defendants instructed the Intern not to complete the task that Plaintiff assigned to her and then asserted Plaintiff "may not be completing tasks within the deadlines."

(Doc. 18 at 23, ¶¶ 102-03.) Director Montoya did not receive the completed task until November 1, 2016. On November 3, 2016, Director Montoya reported the incident to WRJ-VAMC human resources personnel.

The third issue raised in Director Montoya's Probationary Written Counseling concerned Plaintiff appearing to have fallen asleep during a meeting on November 2, 2016. Both Director Montoya and the public affairs intern witnessed Plaintiff sleeping. *See* Doc. 47-28 at 3 (Tang Dep. Tr. 48:20-22) ("Q. Do you remember the Plaintiff falling asleep at the meeting? A. I do."); Doc. 47-29 at 9 (Montoya MSPB Test. Tr. 179:18-20) ("Q. And why did you think that you were observing Mr. Anglin falling asleep? A. Because I looked over at him and his eyes were closed."). Director Montoya reported the

---

[8] Defendant states that the purpose of Plaintiff's leave from work was to sit for the State Bar of California's First Year Law Students' Exam. Although Plaintiff characterizes this issue as irrelevant, he does not contradict it. *See* Doc. 48-2 at 17, ¶ 38.

incident to WRJ-VAMC human resources personnel the next day. Although Plaintiff denies that he fell asleep, he acknowledges he could have presented the appearance of having fallen asleep because he was double-tasking during the meeting by looking down "emailing and texting . . . underneath the table[.]" Doc. 47-13 at 27-28 (Pl.'s Dep. Tr. 129:22-130:10); *see also id.* at 31 (Pl.'s Dep. Tr. 133:11-13) ("The meeting that day, could someone have thought I was nodding off? It is always possible.").

The fourth and final issue raised in Director Montoya's Probationary Written Counseling concerned Plaintiff's use of a racial epithet in an email to Director Montoya on November 3, 2016. Director Montoya forwarded the email to WRJ-VAMC human resources personnel that same day. Plaintiff admitted in his deposition that, in the days after he received the counseling letter, he "thought [he] was going to get fired for" the "N-word" issue. *See id.* at 38 (Pl.'s Dep. Tr. 161:11-12).

In the counseling letter, Director Montoya explained that Plaintiff's conduct "negatively impacts the efficiency of the service and will not be tolerated" and that the counseling letter could "be used to support probationary termination should [Plaintiff] fail to improve [his] conduct to an acceptable level." (Doc. 47-19 at 2.)

On November 7, 2016, the same day he received the letter of Probationary Written Counseling, Plaintiff contacted the VA Office of Resolution Management by telephone to complain of age discrimination at the WRJ-VAMC. During the EEOC proceedings in 2017, Plaintiff testified:

> I filed this complaint as a direct result of the counseling letter that happened. I called to file that complaint right after, because I just felt those four items in the counseling letter was going to lead to a firing or dismissal, and I felt it was based on age.

Doc. 47-9 at 23 (Pl.'s Dep. Tr. 88:6-15). Plaintiff believed Director Montoya "was going to try to terminate" him and that he "didn't think he would" once Plaintiff "filed an EEOC complaint. But he did." *Id.* (Pl.'s Dep. Tr. 89:23-25).

On Wednesday, December 7, 2016, an article titled "VA Department Seeks to Close Part-Time Clinics in Colebrook, Berlin to Staff Full-Time Clinic in Littleton," was published in the *New Hampshire Union Leader*. (Doc. 48-14 at 1-2.) The article

contained quotes attributed to Plaintiff. On Thursday, December 8, 2016, at 7:40 A.M.,
Director Montoya emailed Plaintiff:

> I am unsure when you gave this interview to the Union Leader however,
> today I need you to contact them directly and correct the inaccuracies that
> are noted in the article. I spent 2+ hours yesterday cleaning this up with our
> congressional stakeholders (to include having a personal call with
> Congresswoman Kuster) as well as other media outlets.

(Doc. 47-33 at 1.) Four minutes later, Plaintiff responded: "I spent most of last night
cleaning it up with reporters. I have already reached out to [the author]. I will keep you
advised. I suppose if there was one consistency—the entire story was actually incorrect—
including the quote he attributed to me." *Id.* Later that morning, Director Montoya
forwarded Plaintiff's response to Matthew Mulcahy, the then-Assistant Director of WRJ-
VAMC, who forwarded it to WRJ-VAMC human resources personnel.

The next day, Friday, December 9, 2016, the VA terminated Plaintiff's
probationary employment. The notice of termination stated that Plaintiff "fail[ed] to
qualify during [his] probationary trial period" due to "unacceptable performance."
(Doc. 18-15 at 1.) Director Montoya recommended the termination.

On December 12, 2016, Plaintiff wrote to a former VA colleague:

> I suppose [Director Montoya] could have let me go a number of ways. As
> one option, he could have just manned up and said he was not going to
> recommend me at the end of my probationary period.
>
>                          . . .
>
> I can honestly say, I saw this coming from a mile away. I just didn't want to
> believe it, because there was no logical reason for him to do it. I admitted I
> was looking for another job. I was absolutely honest with him[,] and he
> admitted he didn't want someone with my skills as a PAO. (He wanted
> someone with quite a bit less skills).

(Doc. 47-20 at 1.)

On December 13, 2016, Director Montoya informed his supervisor Dr. Michael
Mayo-Smith:

> Wanted to give you a heads-up on a potential issue. On Friday, I terminated
> my Public Affairs Officer during his probationary period. There were
> performance issues that I will not elaborate on (should they rise to your

level). I have heard all day today that he intends to "go to the press" on his
wrongful treatment . . . . Just wanted to keep you in the loop. Currently I
have an acting PAO (Andy La[C]asse).

(Doc. 41-16 at 1.) In a later signed declaration, Director Montoya stated that

"[c]onsideration of age played absolutely no part in my decision to terminate [Plaintiff]

Anglin's probationary employment[,]" and that he "terminated [Plaintiff's] probationary

employment at the WRJ-VAMC because I was concerned by his performance and by his

conduct, and because I had lost confidence in his ability to perform as expected and to

conduct himself appropriately." (Doc. 47-5 at 3, ¶¶ 13-14.)

When asked in the course of this case, pursuant to Fed. R. Civ. P. 36, to admit or

deny certain facts, Plaintiff responded:

> [] Plaintiff is without knowledge sufficient to admit or deny that, in the
> verbal communications with Alfred Montoya, Montoya never uttered the
> phrase "more suitable for your age and experience."

> [] Plaintiff is without knowledge sufficient to admit or deny that, in the
> written communications with Alfred Montoya, Montoya never authored the
> phrase "more suitable for your age and experience."

> [] Plaintiff is without knowledge sufficient to admit or deny that [the
> purported April 2016 agenda] Exhibit 3 to my First Amended Complaint
> (ECF Doc. No. 18-13) is a document that I authored.

Doc. 47-53 at 3, ¶¶ 18-20 (Pl.'s Resp. to Def.'s Request for Admissions ("RFA")).

### B.    The WRJ-VAMC PAO After Plaintiff's Termination.

On December 13, 2016, Director Montoya designated Andrew LaCasse as Acting

Public Affairs Officer at WRJ-VAMC. (Doc. 47-58 at 1.) Plaintiff acknowledges that, on

that date, "Mr. LaCasse was delegated temporary PAO[.]"[9] (Doc. 41 at 5, ¶ 22.) Mr.

LaCasse served as Acting PAO until May 15, 2017. At the time of his appointment, Mr.

LaCasse was fifty-seven years old and had six years of prior experience in public affairs

at WRJ-VAMC. *See* Doc. 41-12 at 44 (LaCasse Dep. Tr. 44:4-8).

---

[9] Plaintiff states that "[o]n December 13, 2016, Mr. LaCasse was delegated temporary PAO, after
[Ms.] Tang left on maternity leave[,]" (Doc. 41 at 5, ¶ 22), however, Defendant asserts that Ms.
Tang testified that she began her maternity leave in February 2017. *See* Doc. 46-3 at 5, at ¶ 22.
This dispute is immaterial given that both parties agree that Mr. LaCasse became PAO on
December 13, 2016.

Mr. LaCasse did not apply to be PAO but was "asked [] to perform the job because of [his] experience in that position prior" which included "all public affairs, even to include the online and social media aspects." *Id.* at 10-12 (LaCasse Dep. Tr. 10:2-4; 11:22-12:7). His prior experience occurred while he was Assistant to the Director. Mr. LaCasse testified that he had "full control of the regular public affairs duties . . . as [he] could execute them." *Id.* at 13 (LaCasse Dep. Tr. 13:9-11). When Mr. LaCasse left the PAO position six months later in May 2017, responsibility for public affairs at WRJ-VAMC shifted to Becky Rhoads, then the Executive Assistant to the Director. *See* Doc. 47-59 at 3 (Rhoads Dep. Tr. 22:19-23).

### C.    Ms. Tang's Employment at WRJ-VAMC.

On August 19, 2016, Katherine Tang began a Technical Career Field ("TCF") program internship in the area of public affairs as a GS-1035-07 Public Affairs Specialist. Ms. Tang, who was born in 1987, was hired and supervised by Margaret Willoughby, Director of Communications for the VA's National Center for Post-Traumatic Stress Disorder. Ms. Tang's two-year internship was located at WRJ-VAMC. Ms. Tang returned from a maternity leave in May 2017.

In August 2017, after successfully completing the first year of the two-year internship, Ms. Tang was promoted from a GS-07 to GS-08. In August 2018, Ms. Tang successfully completed the second year of her internship, and was noncompetitively placed into a GS-11 position at WRJ-VAMC effective August 19, 2018, by then-Acting Director Matthew Mulcahy. Ms. Tang continues to work in public affairs at WRJ-VAMC as does Lynne Davis, the TCF intern who succeeded her.

### VI.    The Disputed Facts.

At times during Plaintiff's employment, Plaintiff and Director Montoya met weekly. Plaintiff asserts the meetings were to discuss and review his duties, responsibilities, and performance. (Doc. 41 at 4, ¶ 8.) Defendant responds that Plaintiff and Director Montoya met regularly to discuss the matters on which Plaintiff was working, strategies, and action items for the public affairs program at WRJ-VAMC. (Doc. 46-3 at 2, ¶ 8.) The parties disagree as to when Plaintiff began preparing written

agendas for the weekly meetings. Plaintiff asserts he was required to create a written record for each weekly meeting. (Doc. 41 at 4, ¶ 9.) Defendant states that Director Montoya required Plaintiff to prepare a basic form of agenda in advance of their weekly meetings beginning in September 2016 until Plaintiff was terminated in December 2016. (Doc. 47-5 at 2, ¶¶ 8-10.) There are eight weekly meeting agendas sent via email from Plaintiff to Director Montoya between September 2, 2016 and December 2, 2016 in the record. *See* Docs. 47-44, 47-45. In addition, Plaintiff's FAC and motion for summary judgment include as an exhibit an undated one-page agenda without an email cover page which Plaintiff contends he drafted in April of 2016. *See* Docs. 18-13, 41-6.

Plaintiff maintains that during the weekly meeting documented in the undated one-page "Director/Public Affairs Weekly Meeting" agenda document, he and Director Montoya discussed a "requirement to find employment more suitable for [Plaintiff's] age and experience[.]" Doc. 41 at 4-5, ¶ 20 (brackets in original) (internal quotation marks omitted); *see also* Doc. 41-6 (purported April 2016 weekly meeting agenda). The document states: "Al will assist." (Doc. 41-6 at 1.) Director Montoya testified at a deposition in connection with the MSPB action that he did not recall the requirement to find employment more suitable for Plaintiff's age and experience. *See* Doc. 41-10 at 3 (Montoya Dep. Tr. 7:15-19).[10]

Defendant points out that Plaintiff did not include any reference to a requirement to find employment more suitable for Plaintiff's age in his informal or formal EEOC complaints of age discrimination, nor did he mention it in his July 2017 sworn testimony before the EEOC investigator or when interviewed by the VA's Office of Inspector General. (Doc. 47 at 24.) In that testimony, Plaintiff did not reference an age-related remark by Director Montoya, nor did he reference the purported April 2016 agenda. Plaintiff also did not make an age discrimination claim regarding the VA in his letter to Senator Leahy. Moreover, in his November 2017 written EEOC complaint, Plaintiff

---

[10] Plaintiff characterizes this testimony as "Defendant did not deny he discussed, 'Employment,' and a '[r]equirement to find employment more suitable for [Plaintiff's] age and experience[.]'" *See* Doc. 41 at 4-5, ¶ 20 (citing Doc. 41-10 at 3).

alleged: "The petitioner verily believes [Director Montoya] is retaliating for filing an age discrimination complaint against the IRS. There is no other logical explanation[.]" (Doc. 47-38 at 13, ¶ 64.)

Defendant contends that the first time Plaintiff alleged the age-based remark by Director Montoya,[11] and the first time that he offered the purported April 2016 agenda as evidence, was on August 12, 2019, when he filed with the EEOC his opposition to the VA's motion for summary judgment in his administrative proceedings. The filing included a declaration to which he attached the purported April 2016 agenda and the contention that: "The nexus between age and the adverse action is circumstantial, and can be implied from Plaintiff's claim and evidence he was required by Defendant to look for a new job more suitable for his age and qualifications[.]"[12] (Doc. 47-50 at 7.) Plaintiff asserted:

> Evidence of the agreement . . . is evidenced in a document identified by the Defendant as the type of document that "consisted primarily of agenda[s] Mr. Anglin drafted" (Appendix "A.") (ref: Defendant's affidavit in the agency's response dated July 24, 2019, to the motion to compel). The agenda list of topics included a: "requirement to find employment more suitable for age and experience . . . Al will assist" (Appendix A).

*Id.* Defendant's affidavit, to which Plaintiff refers, is a declaration that Director Montoya executed in support of the VA's response to Plaintiff's motion to compel discovery in his EEOC case, in which Director Montoya stated:

> Mr. Anglin has requested "All notes, documents, recordings (audio visual), and records detailing the discussions and context, of the weekly meetings from January 2016 to November 2016 between the Complainant and Alfred Montoya." The documents I am aware of relating to such meetings have been previously provided to Mr. Anglin and consisted primarily of agendas Mr. Anglin drafted for the weekly meetings from September to December

---

[11] At his deposition in this case, Plaintiff testified he did not consider Director Montoya's remark regarding age "as hostile at the time" and thought Director Montoya "was actually willing to help me look for a better job." (Doc. 47-10 at 39; 41 (Pl.'s Dep. Tr. 124:13-16; 131:9-10).) However, in hindsight, he viewed the alleged comment as discriminatory.

[12] Plaintiff cited his July 2017 testimony in support of his argument, but that testimony does not state Director Montoya required Plaintiff to find a job more suitable for his age. *See* Doc. 47-9.

2016. I have made a reasonable search for responsive information and do
not have other relevant information pertaining to Mr. Anglin's request.

(Doc. 47-48 at 9.) Director Montoya never "identified" the purported April 2016 agenda
and it was not among the materials the VA produced to Plaintiff.

Plaintiff, in his July 2019 motion to compel filed in the EEOC case, attached the
weekly meeting agendas the VA had produced and suggested that they were not the type
of records he was seeking, arguing: "It is the position of the movant that these documents
are meaningless given the limited amount [of] documentation, the fact that the documents
are not dated, and the fact that the documents lack any reasonable authentication to
identify [the] author." (Doc. 47-46 at 2.) The day after filing his motion to compel, he
emailed VA counsel and stated with regard to the weekly meeting agendas: "So far as I
am concerned[,] they are not records of discussions at the weekly meetings or documents
pertaining to discussions of these weekly meetings." (Doc. 46-47 at 2.)

Based on the factual record, the only genuine issue of material fact is whether
Plaintiff and Director Montoya discussed the need to find employment more suitable to
Plaintiff's age prior to Plaintiff's termination. Whether that factual dispute precludes
summary judgment must be analyzed in the context of Plaintiff's ADEA claim.

## VII.    Conclusions of Law and Analysis.

Generally, filings by self-represented parties are "to be liberally construed" and
"must be held to less stringent standards than formal pleadings drafted by lawyers[.]"
*Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations and internal quotation marks
omitted); *see also Harris v. Miller*, 818 F.3d 49, 56 (2d Cir. 2016) (per curiam). The
Second Circuit has held, however, that attorneys who represent themselves are not
entitled to the special solicitude otherwise provided to litigants representing themselves.
*See Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010). Because Plaintiff is admitted
to the State Bar of California with an active license since April 16, 2021, *see* Doc. 47-53
at 3, ¶¶ 11-12, his filings are not entitled to liberal construction.

## A.    The ADEA.

"[T]he ADEA provides the exclusive remedy for federal employees who allege age discrimination." *Bumpus v. Runyon*, 1997 WL 154053, at *4 (S.D.N.Y. Apr. 2, 1997), *aff'd*, 152 F.3d 917 (2d Cir. 1998). "All personnel actions affecting employees . . . who are at least [forty] years of age . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). The Supreme Court has recently interpreted this language as "requir[ing] proof of but-for causation, but the object of that causation is 'discrimination,' *i.e.*, differential treatment, not the personnel action itself." *Babb v. Wilkie*, 589 U.S. 399, 411 (2020). Thus, "age need not be a but-for cause of an employment decision in order for there to be a violation of § 633a(a)." *Id.* at 404.

A personnel action violates § 633a where "age [is] the but-for cause of *differential treatment*" in the decision. *Id.* at 408 (emphasis in original). In addition, in cases where a plaintiff seeks "reinstatement, backpay, compensatory damages, or other forms of relief related to the end result of an employment decision . . . , th[e] plaintiff[] must show that age discrimination was a but-for cause of the employment outcome." *Id.* at 413. If a plaintiff shows "that age was a but-for cause of differential treatment in an employment decision but not a but-for cause of the decision itself[,]" then he or she may "seek injunctive or other forward-looking relief." *Id.* at 414.

A plaintiff may "prevail on an employment discrimination claim [by] . . . 'present[ing] direct evidence of discrimination[]' . . . [or] produc[ing] indirect evidence that satisfies 'the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).'" *Williams v. D'Youville Coll.*, 2024 WL 69846, at *3 (W.D.N.Y. Jan. 5, 2024) (citations omitted); *see also Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) ("It is well established that the burden-shifting framework set forth by the Supreme Court in [*McDonnell Douglas*] applies to claims brought under the ADEA."); *Bart v. Golub Corp.*, 96 F.4th 566, 569-76 (2d Cir. 2024) (discussing application of *McDonnell Douglas* framework to employment discrimination claims post-*Babb*).

Under the *McDonnell Douglas* framework, if a plaintiff establishes a prima facie case, the defendant must articulate a legitimate, non-retaliatory reason for its challenged action. *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107-08, 112 (2d Cir. 2019); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (explaining the employer need only proffer an explanation that, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action") (emphasis omitted). This burden is "one of production, not persuasion[,]" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000), and "is not a particularly steep hurdle." *Hyek v. Field Support Servs., Inc.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010), *aff'd*, 461 F. App'x 59 (2d Cir. 2012). If the defendant employer meets its burden, "the presumption [of age discrimination] raised by the prima facie case is rebutted and drops from the case[.]" *St. Mary's Honor Ctr.*, 509 U.S. at 507 (internal quotation marks and citation omitted). The plaintiff must then show that the offered justification is pretextual. *Lenzi*, 944 F.3d at 108, 112. As a result, "[t]he plaintiff bears the ultimate burden of persuading the court that []he has been the victim of intentional discrimination" by a preponderance of the evidence. *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 177 (2d Cir. 2023) (internal quotation marks omitted); *see also St. Mary's Honor Ctr.*, 509 U.S. at 507.

## B.    Whether the Court Should Grant Summary Judgment on Plaintiff's ADEA Claim.

Plaintiff argues that direct evidence shows the decision to terminate Plaintiff was "tainted by discrimination." (Doc. 41 at 7) (capitalization and emphasis omitted). He points to the disputed April 2016 agenda which included the statements "[r]equirement to find employment more suitable for age and experience" and "Al will assist[,]" (Doc. 41-6 at 1), as "substantive evidence for concluding that Plaintiff's termination was not free of age discrimination." (Doc. 41 at 9.) These statements, however, are not direct evidence that Plaintiff's termination over seven months later in December 2016 was based on his age. They do not pertain to Plaintiff's termination or alleged differential treatment, they instead pertain to Director Montoya's agreement to assist Plaintiff in finding alternative employment in light of Plaintiff's concerns regarding the mismatch between his skill set

and the demands of the position he occupied. *Compare Rose v. N.Y.C. Bd. of Educ.*, 257 F.3d 156, 160-61 (2d Cir. 2011) (finding decisionmaker's statements that "he would replace [employee] with someone younger and cheaper" to be direct evidence of discriminatory animus) (internal quotation marks omitted). Plaintiff points to no other direct evidence that suggests his differential treatment was due to his age. In the absence of direct evidence of age discrimination, the *McDonnell Douglas* burden-shifting framework applies.

> Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of age discrimination by showing (1) that []he was within the protected age group, (2) that []he was qualified for the position, (3) that []he experienced adverse employment action, and (4) that the action occurred under circumstances giving rise to an inference of discrimination.

*Lively v. WAFRA Inv. Advisory Grp.*, 6 F.4th 293, 302 n.3 (2d Cir. 2021) (internal quotation marks omitted). This initial burden is "de minimis[.]" *Timbie v. Eli Lilly & Co.*, 429 F. App'x 20, 22 (2d Cir. 2011).

As it is undisputed that Plaintiff is over the age of forty and was terminated, prongs one and three of his prima facie case have been established. Plaintiff asserts that he was qualified for the position "based on his annual review provided on November 8, 2016[.]" (Doc. 41 at 11.) Although Defendant asserts it is "arguabl[e]" whether Plaintiff was qualified because the reason for his termination was "failure to qualify during [his] probationary period" (Doc. 47 at 12 n.6) (internal quotation marks omitted), it does not contend this issue is disputed. In the light most favorable to Plaintiff, the court infers from Plaintiff's hiring for the PAO position and from his fully successful rating on his performance appraisal for the period ending September 30, 2016, that he was qualified for his probationary position and thus prong two has been established as well.

Turning to prong four, Plaintiff asserts that his replacement was "substantially younger and less qualified[.]" (Doc. 41 at 11.) Defendant does not concede this point because Ms. Tang did not actually replace Plaintiff as PAO but was instead hired at Plaintiff's GS-11 position only after two employees over the age of forty occupied it.

However, where, as here, "a replacement within the protected class follows a complaint of discrimination, such timing can support rather than undermine an inference of discrimination." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 27 (E.D.N.Y. 2015).

It is undisputed that Plaintiff complained of age discrimination on November 7, 2016, was terminated thereafter, and Mr. LaCasse was hired on December 12, 2016. Mr. LaCasse returned to his former position in May 2017, the same month Ms. Tang returned from maternity leave. Because Plaintiff was terminated and ultimately replaced by a younger employee, at the prima facie stage and, in light of Plaintiff's minimal burden, Plaintiff has established a prima facie case of age discrimination. The court thus proceeds to the next step of the *McDonnell Douglas* framework.

At this next step, Defendant must articulate legitimate, nondiscriminatory reasons for Plaintiff's termination. Director Montoya provided Plaintiff with a performance appraisal for his employment through September 30, 2016. Although Plaintiff was rated "fully successful" on the summary rating form (Doc. 47-14 at 3), Director Montoya also provided a written appraisal wherein he stated that Plaintiff "struggled with various elements in his performance plan." *Id.* at 11. He noted "[t]here have been several occasions w[h]ere members of the facility have raised issues on proper feedback[.]" *Id.* Director Montoya also stated he "would encourage" Plaintiff "to establish a process in which events such as 'Coffee with the Director' have the appropriate number of staff in place to participate" and "to get involved in the culture of continuous improvement, learning[,] and innovation." *Id.*

On November 7, 2016, Director Montoya issued Plaintiff a letter of Probationary Written Counseling. Plaintiff was reminded that the first year of his employment was a probationary period[13] and was informed that the "formal letter of counseling" was issued

---

[13] Under federal regulations, probationary employees may be terminated for problems even if those problems would not be good cause for terminating a permanent employee. *See generally* 5 C.F.R. §§ 315.801-.806 (2005) (rules governing probationary employment). The regulations state that an "agency shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." *Id.* § 315.803(a).

to him to address concerns that he was "establishing an unacceptable pattern of conduct." (Doc. 47-19 at 1.) These concerns included difficulty completing tasks within established deadlines, inappropriate delegation of tasks to other individuals, apparently sleeping during a meeting, and using the N-word which Plaintiff, himself, conceded he expected would result in his immediate termination. In the letter of counseling, Director Montoya emphasized that "[a]t no time is the [N-word] appropriate in the work place[.]"[14] *Id.* at 2. Director Montoya informed Plaintiff that the described conduct "negatively impacts the efficiency of the service and will not be tolerated" and that the counseling letter could "be used to support probationary termination should [Plaintiff] fail to improve [his] conduct to an acceptable level." *Id.*

Shortly thereafter, Plaintiff, in the core capacity of his employment as a PAO, engaged in communication with the press that all parties concede was problematic. On the day prior to Plaintiff's termination, Director Montoya emailed Plaintiff regarding inaccuracies in a December 7, 2016 Union Leader article for which Plaintiff was a source and requested that Plaintiff contact the publisher. Plaintiff conceded that "the entire story was [] incorrect[,] including the quote [] attributed to me." (Doc. 47-33 at 1.)

On Friday December 9, 2016, the WRJ-VAMC terminated Plaintiff's probationary employment. Plaintiff was informed in writing that Director Montoya "recommended that [Plaintiff] be terminated . . . for failure to qualify during [the] probationary/trial period." (Doc. 18-15 at 1.) Plaintiff was terminated "due to unacceptable performance." *Id.* In a later signed declaration, Director Montoya stated that "[c]onsideration of age played absolutely no part in my decision to terminate [Plaintiff] Anglin's probationary employment[.]" (Doc. 47-5 at 3, ¶ 13.) He explained that he "terminated [Plaintiff's]

---

[14] Courts in the Second Circuit have held that the use of the N-word is a legitimate and nondiscriminatory reason for terminating employment. *See, e.g., Del Villar v. Hyatt Hotel Corp.*, 2022 WL 2316205, at *2-3 (S.D.N.Y. June 28, 2022) (rejecting plaintiff's claim that her termination was unwarranted because she used the epithet to make a point about offensive language). Indeed, this court has recognized that "use of the N-word in the workplace is particularly odious and offensive." *EEOC v. 98 Starr Rd. Operating Co.*, 2023 WL 4557751, at *8 (D. Vt. July 17, 2023) (internal quotation marks and alteration omitted).

probationary employment at the WRJ-VAMC because I was concerned by his performance and by his conduct, and because I had lost confidence in his ability to perform as expected and to conduct himself appropriately." *Id.* ¶ 14. Defendant has met its burden to proffer an explanation that, "taken as true, would permit the conclusion that there was a nondiscriminatory reason" for Plaintiff's termination. *St. Mary's Honor Ctr.*, 509 U.S. at 509.

Because Plaintiff satisfied the de minimis requirements of a prima facie case of age discrimination and Defendant proffered non-retaliatory reasons for his termination, the ultimate burden reverts to Plaintiff to show "intentional discrimination." *Carr*, 76 F.4th at 177 (internal quotation marks omitted). In light of Plaintiff's request for back pay and compensatory damages, *see* Doc. 18 at 38, ¶ 187, he must establish that his employment would not have been terminated but-for age discrimination. Viewing the evidence in the light most favorable to Plaintiff and resolving any disputed facts in his favor, no rational jury could find Plaintiff has satisfied this burden.

Plaintiff points to the purported April 2016 agenda statement and his alleged ultimate replacement with a younger employee, Ms. Tang, as reasons why the WRJ-VAMC's justifications for his termination are pretextual. The disputed April 2016 agenda contains a "requirement to find employment more suitable for age and experience[,]" (Doc. 41-6 at 1), which Plaintiff contends is also referenced in Plaintiff's September 2016 letter to Senator Leahy wherein Plaintiff claims that he and Director Montoya agreed to "endeavor to match [Plaintiff] to a more suitable position." (Doc. 46-41 at 1.) The Leahy letter, however, only mentions Plaintiff's age discrimination claim against the IRS.

A stray statement in a contested agenda is insufficient to show the requisite discriminatory intent. The Second Circuit has explained that:

> The more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination. . . . The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative the remark will be.

*Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (citation and brackets omitted); *see also Lively*, 6 F.4th at 306-07 (observing "[s]tray age-related remarks are insufficient to raise an inference of discriminatory motive unless they (1) were made repeatedly, (2) drew a direct link between discriminatory stereotypes and the adverse employment decision, and (3) were made by supervisors who played a substantial role in the decision to terminate") (internal quotation marks and brackets omitted). Although allegedly made by Director Montoya, the decisionmaker involved in Plaintiff's termination, Plaintiff is the sole author of the document in which the remark is contained and the passage of over seven months between the alleged remark and Plaintiff's termination dispels any inference of discriminatory intent. *See Bentley-Ammonds v. Northwell Health, Inc.*, 2022 WL 893716, at *2 (2d Cir. Mar. 28, 2022) (finding remarks made more than three months before termination and in contexts unrelated to performance, retention, or eventual termination to be insufficient to find that the termination was motivated by discriminatory animus). Notably, in his responses to Defendant's requests to admit, Plaintiff stated he was without knowledge sufficient to admit or deny whether the statement was made. *See* Doc. 47-53 at 3, ¶¶ 18-19. As a result, Plaintiff has not demonstrated a genuine issue of material fact that Defendant's reasons for his termination are pretextual.

To the extent Plaintiff contends that he was ultimately replaced by Ms. Tang, an employee significantly younger than him, that alone is not enough to sustain his burden. *See Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 135 (E.D.N.Y. 2013) ("Although not determinative on its own, the fact that plaintiff's replacement was significantly younger than him is a factor (among others) from which the jury could . . . infer[] age discrimination[.]") (citation omitted). Undisputed evidence demonstrates that Plaintiff was replaced by Mr. LaCasse, an employee just a few years younger than Plaintiff and above forty years of age. *See Inguanzo v. Hous. & Servs., Inc.*, 2014 WL 4678254, at *19 (S.D.N.Y. Sept. 19, 2014) ("Where a member of the plaintiff's protected class is contemporaneously hired as a replacement, the offering of proof of intentional discrimination appears extremely difficult, if not practically impossible.")

(internal quotation marks omitted). Director Montoya appointed Mr. LaCasse as Acting PAO for WRJ-VAMC on Tuesday December 13, 2016, two business days after Plaintiff's termination. Mr. LaCasse served in that capacity until May 2017.

Ms. Tang was not appointed to Plaintiff's former position as PAO at the GS-11 level until August 2018, upon completion of her two-year internship, twenty months after Plaintiff's termination. The appointment was not made by Director Montoya, but by then-Acting Director Mulcahy. In light of these undisputed facts, Plaintiff has not produced evidence supporting an inference that his replacement by Mr. LaCasse was "subterfuge to disguise age discrimination." *See McCarthy v. N.Y.C. Tech. Coll. of City Univ.*, 202 F.3d 161, 165 (2d Cir. 2000) (noting "[r]eplacement by an older person may not necessarily be fatal to an age discrimination claim if, for example, a plaintiff can show that his age was the true motivation and the older replacement was hired temporarily as a means of insulating defendant from ADEA liability"). For these reasons, although Ms. Tang was younger than Plaintiff, in light of the passage of time, Mr. LaCasse's intervening employment, and Ms. Tang's appointment by a different decision-maker, no rational inference of discrimination may be found. *See Amarosa v. Am. Nat'l Red Cross*, 2014 WL 3696255, at *4 (E.D.N.Y. July 24, 2014) (finding that no discrimination could be inferred where, "[a]lthough [eventual replacement] was significantly younger than plaintiff, he was not her immediate replacement").

Plaintiff must produce "more than [a] few isolated pieces of contrary evidence to survive summary judgment[.]" *Richardson v. Comm'n on Human Rts. & Opportunities*, 532 F.3d 114, 125 (2d Cir. 2008). In this case, he has failed to produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [Defendant] were false[.]" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks omitted). This conclusion is buttressed by the fact that Director Montoya, who allegedly discriminated against Plaintiff, also hired Plaintiff's fifty-seven-year-old replacement. *See Paraka v. Univ. of Rochester*, 136 F. Supp. 3d 481, 485 (W.D.N.Y. 2015) (recognizing that "'where the person who made the decision to fire was the same person who made the decision to hire, it is difficult to

30

impute to [him] an invidious motivation that would be inconsistent with the decision to hire'") (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)). Plaintiff was also "well within" the protected class at the time he was hired. *See James v. N.Y. Racing Ass'n*, 76 F. Supp. 2d 250, 255 (E.D.N.Y. 1999) (observing that "the inference of discrimination is much weaker where the plaintiff employee is well within the protected class when first hired") (internal quotation marks omitted). Accordingly, to the extent Plaintiff alleges Defendant was motivated by age discrimination, his own hiring belies that claim.

Because no rational jury could conclude that the proffered reasons for Plaintiff's termination were pretextual and that instead Defendant was motivated in whole or in part by discriminatory intent based on Plaintiff's age, Defendant's motion for summary judgment must be GRANTED and Plaintiff's motion for partial summary judgment must be DENIED. *See Jones v. Shinseki*, 804 F. Supp. 2d 665, 674-76 (M.D. Tenn. 2011) (holding plaintiff failed to show VA's proffered reasons for termination during probationary period were pretextual even where plaintiff was replaced by a younger employee and had received a "Fully Successful" rating in a performance appraisal) (internal quotation marks omitted).

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment (Doc. 47) is GRANTED and Plaintiff's motion for partial summary judgment and "in limine" (Doc. 41) is DENIED. The court enters judgment in Defendant's favor on each count of Plaintiff's First Amended Complaint.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this ___31st___ day of March, 2025.

Christina Reiss, Chief Judge
United States District Court

31